**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 14-4724**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOAQUIN GONZALEZ VICENCIO, a/k/a Joaquin Gonzalez Chairez,

Defendant - Appellant.

**No. 14-4746**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOAQUIN BERUMEN CORTES,

Defendant - Appellant.

Appeals from the United States District Court for the Western District of Virginia, at Harrisonburg. Glen E. Conrad, Chief District Judge; Michael F. Urbanski, District Judge. (5:13-cr-00015-GEC-1; 5:13-cr-00015-GEC-2)

Argued: December 8, 2015          Decided: April 26, 2016

Before MOTZ, KING, and KEENAN, Circuit Judges.

Affirmed by unpublished per curiam opinion.

---

**ARGUED**: Michael Thayer Hemenway, THE LAW OFFICES OF MICHAEL T. HEMENWAY, Charlottesville, Virginia; Russell Darren Bostic, BOSTIC & BOSTIC, PC, Harrisonburg, Virginia, for Appellants. Elizabeth G. Wright, OFFICE OF THE UNITED STATES ATTORNEY, Harrisonburg, Virginia, for Appellee. **ON BRIEF**: Anthony P. Giorno, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

The defendants, Joaquin Gonzalez Vicencio and Joaquin Berumen Cortes, were convicted and sentenced in the Western District of Virginia for conspiracy, manufacturing marijuana, and using a hazardous substance on federal land while manufacturing marijuana. Berumen Cortes was separately convicted and sentenced for illegally reentering the United States. Gonzalez Vicencio and Berumen Cortes maintain that the district court committed error as to Count Three. Specifically, they argue — for the first time on appeal — that the government failed to prove, in connection with their hazardous substance convictions, that they knew they were on federal land. Additionally, Berumen Cortes challenges the district court's denial of sentencing relief under the safety valve provision of 18 U.S.C. § 3553(f). As explained below, we reject their contentions and affirm.

## I.

## A.

On August 1, 2013, the federal grand jury in Harrisonburg, Virginia, returned a four-count indictment against Gonzalez Vicencio and Berumen Cortes. Count One charged them with conspiracy to manufacture marijuana, in violation of 21 U.S.C. § 846. Count Two alleged a substantive marijuana manufacturing

3

offense under 21 U.S.C. § 841(a)(1) and (b)(1)(A). Count Three charged the two defendants with using a hazardous substance on federal land while manufacturing marijuana and thereby causing environmental damage, in contravention of 21 U.S.C. § 841(b)(6). Finally, Count Four charged Berumen Cortes with illegally reentering the United States, in violation of 8 U.S.C. § 1326(a).

## B.

In December 2013, the district court conducted the three-day jury trial of Gonzalez Vicencio and Berumen Cortes in Harrisonburg. We recite the evidence in the light most favorable to the government. See United States v. Perry, 757 F.3d 166, 175 (4th Cir. 2014).

## 1.

In June 2013, Agent Willis, an officer of the Virginia State Police and supervisor of the Alleghany Highlands Drug Task Force, responded to an informant's report that "somebody had been growing something" in the George Washington National Forest in Highland County, Virginia (the "National Forest"). See J.A. 24.[1] Willis met with the informant, and they walked together a few hundred feet into the National Forest. As they crested a

---

[1] Citations herein to "J.A. __" and "S.J.A. __" refer to the contents of the Joint Appendix and Supplemental Joint Appendix filed by the parties in these appeals.

small hill, Willis saw a partially cleared area where a plot of marijuana plants was growing. Although the informant advised that there were other suspicious plots nearby, Willis decided that they should withdraw from the area for safety reasons.

Upon leaving the National Forest, Agent Willis reported his discovery of marijuana to state and federal law enforcement authorities, including the United States Forest Service. A few days later, on the morning of July 2, 2013, four officers — Willis, Agent Mullins of the State Police, and Forest Service Officers Fisher and Buchanan — went to the marijuana plot to install surveillance cameras to gather intelligence. As Fisher and Mullins were installing the cameras, Willis spotted a strange-looking object up the hill from their location. After examining the object through binoculars, Willis determined that it was probably a tent or a tarp and decided to investigate further.

Agent Willis and Officer Buchanan soon found a well-worn path leading up the hill, which they followed from the marijuana plot toward the object. In less than a minute, they arrived at a campsite, which consisted of a tent covered by a tarp and enclosed within a small corral, plus a kitchen area covered by a second tarp. They also saw various gardening tools scattered about. After announcing their identity and presence at the campsite, Willis heard movements inside the tent. Willis

5

advised the tent's occupants — first in English and then in Spanish — to come out and surrender with their hands up. In response, Gonzalez Vicencio and Berumen Cortes emerged from the tent and were arrested. Agent Mullins and Officer Fisher promptly joined their colleagues at the campsite, having heard Willis's commands from down the hill. Willis and Buchanan left the two suspects with Mullins and Fisher and quickly surveyed the surrounding area for others, but found no one. The officers then returned to their vehicles — with Gonzalez Vicencio and Berumen Cortes in tow — and sought backup support to gather the marijuana and other evidence.

Further investigation of the area near the campsite led to the discovery of three additional marijuana plots, all within the National Forest and connected to the campsite by walking paths.[2] The four plots were located on land cleared of natural underbrush, and each plot consisted of hundreds of mounds of store-bought topsoil where marijuana plants were growing. The officers ultimately seized nearly 5,000 marijuana plants from the four plots.

---

[2] More specifically, in terms of geography, the marijuana plots were located less than two miles east of the West Virginia-Virginia line, in the watershed of the northern branch of Scaffold Run. Formed on the eastern slope of the continental divide, Scaffold Run flows east to Back Creek, the Jackson River, and then to the James River and the Chesapeake Bay.

The officers also found trash littered throughout the campsite and marijuana plots, including candy wrappers, empty topsoil bags, and plastic cups that had been used for marijuana seedlings. One trash heap, located within a few feet of a stream, contained several empty containers for fertilizer, insecticide, pesticide, rat poison, and other animal repellants. Some of the empty containers bore the marks of animal teeth.

Back at the campsite, the officers found and seized the defendants' cell phones, a notepad, and a day planner. Berumen Cortes's cell phone contained a photograph of himself at the campsite, plus various photographs of the marijuana plots and seedlings growing in plastic cups. The notepad, labeled with Berumen Cortes's name, documented prior work by the defendants at the site and contained notations such as "we watered" and "threw fertilizer." See J.A. 474-75. One notation indicated that Berumen Cortes had planted seeds on May 13 and 14, 2013. The day planner, found in a plastic bag with Gonzalez Vicencio's cell phone, had dates crossed out from June 2 through July 1, 2013, and contained notations about work completed during that thirty-day period, including spreading fertilizer, removing seeds, and fumigating the plots.

2.

At trial, the government introduced the cell phone photographs, Berumen Cortes's notepad, and Gonzalez Vicencio's

7

day planner, as well as maps, photographs, and video footage that detailed the locations of the marijuana plots, the campsite, and the trash heap in the National Forest. The various entries from Berumen Cortes's notepad and Gonzalez Vicencio's day planner were translated from Spanish into English and introduced into evidence.

The prosecutors also introduced the defendants' separate post-arrest statements, which they made during interviews conducted by Forest Service officers with the assistance of a Spanish-language interpreter. In their statements, Gonzalez Vicencio and Berumen Cortes each admitted planting approximately 600 to 700 marijuana plants, watering the plants, and spreading fertilizer on the marijuana plots. Both men acknowledged knowing that growing marijuana was illegal. When asked who had assisted them in the marijuana growing operations, Berumen Cortes explained that he had agreed to tend to the marijuana plots after meeting a man named "Jesus" earlier that year at a bar in Harrisonburg. According to Berumen Cortes, he was to be paid for his work by Jesus after harvesting the marijuana yield. Gonzalez Vicencio also said that he worked for Jesus, whom he had met two years earlier at a bar in North Carolina, and likewise explained that he would receive payment at the conclusion of his work. Finally, both Gonzalez Vicencio and

Berumen Cortes drew maps of the area where they had been apprehended, which showed the campsite and the marijuana plots.

The government's evidence included two expert witnesses. The first expert, a DEA special agent, explained that the marijuana plants were four to six weeks old. The second expert, an environmental conservation specialist, described how the substances found in the trash heap degrade the National Forest's ecosystem. The conservation specialist explained that those chemicals and pesticides posed significant hazards to wildlife. Indeed, they kill insects and small animals and poison larger organisms further up the food chain. Moreover, the gradual leaching of those products into streams, according to the expert, "would cause continual damage" to the environment. See J.A. 382.

After the government rested, Gonzalez Vicencio and Berumen Cortes sought judgments of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. With respect to Count Three, they each contended that there was insufficient evidence that they had used the hazardous substances found in the trash heap near the campsite. Neither asserted, however, that there was a lack of evidence that he knew the campsite and the marijuana plots were on federal land. The prosecutors opposed the Rule 29 motions, and the district court denied them.

9

3.

Gonzalez Vicencio testified in his own defense. He admitted having been at the campsite with Berumen Cortes, but only for the week preceding their arrests. Regarding the previous three months, Gonzalez Vicencio claimed he had been living in White Post, Virginia, a town approximately 150 miles from the marijuana plots. Indeed, he produced a traffic ticket issued on April 15, 2013, in Manassas, Virginia. The ticket bore his signature and a White Post address, and Gonzalez Vicencio explained that he had responded to the ticket in court in June 2013. Gonzalez Vicencio also said that Jesus had offered him work, but had not explained what the work would be. Jesus had driven Gonzalez Vicencio and Berumen Cortes to the campsite and abandoned them without further instructions. Gonzalez Vicencio asserted that he and Berumen Cortes did nothing during the week they were at the campsite, and were awaiting the return of Jesus when they were arrested.

Gonzalez Vicencio acknowledged that the officers had interviewed him after his arrest, but said that he told them he did not know how many plants were at the site. Only after an officer "insisted" that Gonzalez Vicencio provide an estimate did he state that "there would be about 650 to 700" marijuana plants. See J.A. 395. Nevertheless, Gonzalez Vicencio denied planting, watering, or fertilizing any of the plants, and said

10

that he had never seen Berumen Cortes do anything with the plants either. Gonzalez Vicencio explained that he drew the map of the campsite area because one of the officers told him to do so.

Berumen Cortes did not testify, and the defendants called no other witnesses. Gonzalez Vicencio and Berumen Cortes then renewed their Rule 29 motions for judgments of acquittal, incorporating the arguments they raised at the close of the government's evidence. The district court denied the renewed motions.

Following closing arguments by counsel, the district court instructed the jury. As pertinent here, the prosecutors and defense counsel had agreed to instructions on Count Three that tracked the statutory language of 21 U.S.C. § 841(b)(6). As to that count, the court instructed:

> For you to find a defendant guilty of Count Three
> . . . , you must be convinced that the government has
> proven each of the following elements beyond a
> reasonable doubt . . . :
>
>> First, that the defendant manufactured or
>> attempted to manufacture marijuana, a
>> controlled substance;
>>
>> Second, that the defendant knowingly or
>> intentionally used a poison, chemical, or
>> other hazardous substance on federal land;
>>
>> Third, that such use either (a) created a
>> serious hazard[] to humans, wildlife, or
>> domestic animals; or (b) degraded or harmed
>> the environment or natural resources; or (c)

11

> polluted an aquifer, spring, stream, river, or body of water.

See S.J.A. 757. After briefly deliberating, the jury returned verdicts convicting Gonzalez Vicencio and Berumen Cortes on Count Three and all other charges in the indictment.

                              C.

On September 10, 2014, the district court sentenced Gonzalez Vicencio and Berumen Cortes. Berumen Cortes's presentence report ("PSR") initially calculated an advisory range of 97 to 121 months in prison under the Sentencing Guidelines, premised on a total offense level of 30 and a criminal history category of I. Because Berumen Cortes's convictions on Count One and Count Two each carried 120-month statutory minimum sentences, however, the PSR arrived at an advisory Guidelines range of 120 to 121 months.

Berumen Cortes raised two objections to his PSR. First, he objected to the PSR's failure to afford him a reduction for acceptance of responsibility, pursuant to Guidelines section 3E1.1. Second, he claimed eligibility for relief from the 120-month statutory minimum under the safety valve provision of 18 U.S.C. § 3553(f), which permits a sentencing court to impose a sentence within a Guidelines range below a statutory minimum when the defendant has truthfully provided "to the government all information and evidence [he] has concerning the offense or

                              12

offenses that were part of the same course of conduct or of a common scheme or plan," i.e., a complete and truthful disclosure. See 18 U.S.C. § 3553(f). The prosecutors opposed both objections.

In opposing Berumen Cortes's request for § 3553(f) relief, the prosecutors explained that Berumen Cortes had not made the required disclosure. Specifically, when the prosecutors met with Berumen Cortes for a presentencing proffer session, the "discussion went back and forth" on relatively simple questions like where Berumen Cortes lived. See J.A. 562. After several breaks in the questioning, Berumen Cortes's counsel ended the proffer session, and it was never rescheduled. The prosecutors were thus unable to ask Berumen Cortes numerous questions about various activities relating to the scheme and plan, including the origin of the marijuana seeds, the day-to-day operations at the marijuana plots, the details of how Jesus had recruited Berumen Cortes, and how the defendants had obtained the food and supplies found at the campsite. In response, Berumen Cortes's counsel acknowledged that the proffer session was fruitless, explaining that Berumen Cortes had been "confused about some of the questions." See id. at 569. The lawyer maintained, however, that Berumen Cortes "never denied or challenged that he was involved with the marijuana." See id. Moreover, Berumen Cortes's lawyer argued that Berumen Cortes had already disclosed

13

everything he knew about the marijuana plots in his post-arrest statement to the Forest Service officers and in an interview with the probation officer. According to the lawyer, the prosecutors were simply speculating that Berumen Cortes possessed more information.

Ultimately, the district court sustained Berumen Cortes's objection to the PSR regarding his acceptance of responsibility, but overruled his safety valve objection. In so ruling, the court found that Berumen Cortes had not made the disclosure required by § 3553(f), because he had not been entirely forthcoming about his criminal activities. In light of the acceptance of responsibility adjustment, Berumen Cortes's advisory Guidelines sentence was calculated as 120 months in prison, and the court imposed that sentence.[3]

---

[3] Berumen Cortes's codefendant, Gonzalez Vicencio, was sentenced to 134 months in prison. In the defendants' joint opening brief, Gonzalez Vicencio contended that the district court erred in applying a two-level Guidelines adjustment for obstruction of justice. During the pendency of this appeal, however, the court reduced Gonzalez Vicencio's sentence, pursuant to 18 U.S.C. § 3582(c)(2), to the statutory minimum of 120 months. Gonzalez Vicencio now appropriately concedes that any error in the court's calculation of his advisory Guidelines range was harmless, because "there is no legal basis in any argument raised on direct appeal for this Court to approve a sentence under the mandatory minimum." See Reply Br. of Appellants 12; see also United States v. McManus, 734 F.3d 315, 318 (4th Cir. 2013) ("Sentencing error is harmless if the resulting sentence is not longer than that to which the defendant would otherwise be subject." (internal quotation marks omitted)).

Gonzalez Vicencio and Berumen Cortes timely noted these appeals, which we consolidated. We possess jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).[4]

II.

A.

Gonzalez Vicencio and Berumen Cortes now contend — for the first time on appeal — that 21 U.S.C. § 841(b)(6) requires the government to prove that a defendant knows he is on federal land when he uses a hazardous substance in violation of 21 U.S.C. § 841(a). Section 841(b)(6) provides:

> Any person who violates [21 U.S.C. § 841(a)], or attempts to do so, and <u>knowingly or intentionally uses a poison, chemical, or other hazardous substance on Federal land</u>, and, by such use
>
> > (A) creates a serious hazard to humans, wildlife, or domestic animals,
> >
> > (B) degrades or harms the environment or natural resources, or
> >
> > (C) pollutes an aquifer, spring, stream, river, or body of water,
>
> shall be [punished as provided by law].

---

[4] Gonzalez Vicencio and Berumen Cortes have not appealed their convictions on Counts One and Two — the conspiracy and marijuana manufacturing offenses — nor does Berumen Cortes contest his conviction on Count Four for illegally reentering the United States.

15

See 21 U.S.C. § 841(b)(6) (emphasis added). According to Gonzalez Vicencio and Berumen Cortes, § 841(b)(6)'s mens rea requirements extend beyond knowing or intentional use of a hazardous substance to knowledge that such substance is being used on federal land.

Gonzalez Vicencio and Berumen Cortes frame their contention as one of evidence sufficiency, arguing that the prosecutors failed to present any evidence from which the jury could find that either of them knew he was on federal land when he used hazardous substances to manufacture marijuana. Because that argument was never presented to or addressed by the district court, we cannot grant relief unless the plain error standard is satisfied. See United States v. Olano, 507 U.S. 725, 732 (1993).[5]

To satisfy the Olano plain error standard, a defendant must first show: "(1) that an error was made; (2) that the error was plain; and (3) that the error affected his substantial rights." See United States v. Carthorne, 726 F.3d 503, 510 (4th Cir. 2013). Even if those requirements are satisfied, we will exercise our discretion to correct a plain error only when necessary to prevent "a miscarriage of justice" or to ensure

---

[5] Contrary to the defendants' contention, the government maintains that the issue they raise regarding § 841(b)(6) is one of instructional error. However framed, the issue was never presented to or addressed by the district court.

"the fairness, integrity or public reputation of judicial proceedings." See Olano, 507 U.S. at 736 (internal quotation marks omitted). We have recognized that the plain error standard "is strictly circumscribed and meeting all four prongs is difficult, as it should be." See United States v. Byers, 649 F.3d 197, 213 (4th Cir. 2011) (internal quotation marks omitted).

The stringent requirements of plain error review flow from the fundamental principle that a right "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right" in the trial court. See Olano, 507 U.S. at 731 (internal quotation marks omitted). Our strict adherence to the Olano standard "serves to induce the timely raising of claims and objections, which gives the district court the opportunity to consider and resolve them." See Puckett v. United States, 556 U.S. 129, 134 (2009). That inducement engenders judicial efficiency, because the trial court is better suited to address an issue in the first instance. In contrast, a court of appeals sits as "a court of review, not of first view." Cf. Decker v. Nw. Envtl. Def. Ctr., 133 S. Ct. 1326, 1335 (2013) (internal quotation marks omitted). As such, plain error review discourages both mousetrapping and convenient afterthoughts. That is, arguments and objections that are strategically withheld until appeal, or identified only after

17

the trial court has ruled, will not prevail unless the rigorous plain error standard is satisfied.

Importantly, an unpreserved error will constitute plain error "only if it contravenes the law of the Supreme Court or this circuit." See United States v. King, 628 F.3d 693, 700 (4th Cir. 2011) (internal quotation marks omitted). In that regard, we have recognized that "when we have yet to speak directly on a legal issue and other circuits are split, a district court does not commit plain error by following the reasoning of another circuit." See United States v. Shepperson, 739 F.3d 176, 181 (4th Cir. 2014) (internal quotation marks omitted). As a corollary to that principle, the requirements of plain error review are more difficult to satisfy when the unpreserved issue has not been addressed by a court of appeals.

In the context of these proceedings, we are content to assume that an error occurred and that the first prong of Olano has been satisfied. See, e.g., United States v. Godwin, 272 F.3d 659, 679 (4th Cir. 2001) ("Without belaboring the point, we simply assume trial error and proceed with the Olano analysis."). Turning to Olano's second prong, however, it is apparent that Gonzalez Vicencio and Berumen Cortes have failed to demonstrate that the assumed error is plain. Put succinctly, the defendants have not referred us to any authorities — and there are none — that delineate the mens rea requirements of

18

§ 841(b)(6). We therefore conclude that Gonzalez Vicencio and Berumen Cortes fail to satisfy the requirements of plain error review.

B.

Finally, Berumen Cortes challenges the district court's denial of his request for relief under the safety valve provision, 18 U.S.C. § 3553(f). Had the court granted safety valve relief to Berumen Cortes, he would have been eligible for a sentence below the 120-month statutory minimum. The government counters that the court properly found that Berumen Cortes had not made a complete and truthful disclosure to the authorities. We review for clear error a sentencing court's decision to deny a defendant safety valve relief. See United States v. Henry, 673 F.3d 285, 292 (4th Cir. 2012).

The safety valve provision authorizes a sentencing court to afford a first-time offender relief from a mandatory minimum sentence, if the defendant satisfies five requirements. The defendant must shoulder the burden by showing that: (1) he has no more than one criminal history point under the Guidelines; (2) his offense did not involve violence or the possession of a firearm; (3) the offense did not result in serious bodily injury or death; (4) he did not play a leadership role in the offense; and (5) "no later than the time of sentencing, [he] truthfully provided the government with all evidence and information [he]

19

had concerning the offense or offenses comprising the same course of conduct or a common scheme or plan." See Henry, 673 F.3d at 292-93.

As our good Chief Judge recently explained in United States v. Aidoo, "[t]he defendant's burden under the safety valve is a true burden of proof that rests, at all times, on the defendant." See 670 F.3d 600, 607 (4th Cir. 2012). Section 3553(f) is thus a "tell-all provision," and requires the defendant to "persuade the district court that he has made full, truthful disclosure of information required by the safety valve." See id. at 607, 609. Importantly, if the prosecutors oppose a request for safety valve relief, the defendant must present "some kind of evidence" that shows "he had provided the government with complete and truthful disclosure." See id. at 609. Here, the district court specifically found that Berumen Cortes had not revealed to the government everything he knew regarding his criminal activities. It thus denied safety valve relief to Berumen Cortes under the fifth element of § 3553(f). According to the court, Berumen Cortes had "failed miserably" when given the opportunity "to be totally forthcoming and to volunteer information relevant to the case." See J.A. 582-83.

The record provides ample support for the district court's finding on the safety valve issue. For example, Berumen Cortes maintained throughout the district court proceedings that he had

20

been present at the campsite for only one week, but the evidence was strong that Berumen Cortes had been there growing marijuana much longer.  Specifically, Berumen Cortes's notepad showed that he had planted seeds as early as May 13, 2013, nearly two months before his arrest.  In the face of the prosecutor's opposition to safety valve relief, Berumen Cortes failed to rebut the contention that he had not been entirely forthcoming to the government, let alone carry his burden to establish otherwise. We are therefore satisfied that the court did not err in denying Berumen Cortes's request for relief under 18 U.S.C. § 3553(f).

III.

Pursuant to the foregoing, we reject the defendants' contentions of error and affirm the judgments.

AFFIRMED